HARRIS COUNTY FLOOD CONTROL
DISTRICT and Harris County,
Texas, Petitioners,

v.

Edward A. and Norma KERR,
et al., Respondents

NO. 13–0303

Supreme Court of Texas.

Argued December 4, 2014

OPINION DELIVERED: June 17, 2016

Rehearing Denied October 21, 2016

Amy Warr, Alexander Dubose Jefferson & Townsend LLP, Austin, Kevin H. Dubose, Alexander Dubose Jefferson & Townsend LLP, Houston, Melissa Spinks, Harris County-Litigation Managing Attorney, Vincent Reed Ryan, Jr., Harris County Attorney, Houston, for Petitioners.

Brett Wagner, Doherty Wagner LLP, Daryl L. Moore, Daryl L. Moore, P.C., James B. Blackburn Jr., Blackburn Carter, P.C., Mary Bond Conner, Irvine & Conner PLLC, Houston, for Respondents.

Michael Jon Weils Siegel, City of Austin Law Department, Scott A. Brister, Andrews Kurth LLP, Michael Pichinson, Associate General Counsel, John B. Dahill, Texas Conference of Urban Counties, Susan Desmarais Bonnen, Office of the Attorney General, Scott N. Houston, Texas Municipal League, Stacey Steinbach, James P. Allison, Austin, Huma Nisar Ahmed, Fort Bend County Attorney's Office, Richmond, Dan Pozza, Pozza & Whyte, PLLC, San Antonio, Jo Anne Bernal, El Paso County Attorney, Kevin McCary, Assistant County Attorney, Manuel Romero Jr., El Paso County Attorney's Office, El Paso, James Arthur Boone, Allen Boone Humphries Robinson LLP, David Alfred Kahne, Law Office of David A. Kahne, Donna Lynn Edmundson, Houston City Attorney, Judith Lee Ramsey, Chief, General Litigation Section, City of Houston Legal Department, Robert Allen Eckels, Gray Reed & McCraw PC, David Allan McNamara, Port of Houston Authority of Harris County, Texas, Houston, Teresa L. Todd, Jeff Davis County Attorney, Fort Davis, John Clinton Schumacher, W. Scott Hastings, Locke Lord LLP, Dallas, for Amicus Curiae.

JUSTICE WILLETT delivered the opinion of the Court, in which JUSTICE JOHNSON, JUSTICE GUZMAN, JUSTICE LEHRMANN, and JUSTICE BROWN joined.

We granted rehearing in this cause February 19, 2016, and now withdraw the opinion and judgment previously issued and substitute the following opinion.

This long-running dispute poses a question of constitutional law: whether governmental entities that engage in flood-control efforts are liable to homeowners who suffer flood damage, on the theory that the governments effected a taking of the homeowners' property by approving private development without fully implementing a previously approved flood-control plan. Under the circumstances presented, we answer no.

## I. Background

### A. Factual and Procedural Background

Plaintiffs (the homeowners) consist of about 400 homeowners whose homes were located in the upper White Oak Bayou watershed of Harris County. The homes suffered flood damage one or more times when flooding occurred during Tropical Storm Francis in 1998, Tropical Storm Allison in 2001, and another unnamed storm in 2002. The homeowners sued Harris County and the Harris County Flood Control District (collectively the County), asserting a takings cause of action.[1] The homeowners sued other defendants as well, including the Texas Department of Transportation, municipal utility districts, engineering firms, and private developers; those claims were settled or dismissed and are not presented for review.

The District was created under Article XVI, section 59 of the Constitution, which authorizes the creation of conservation and reclamation districts. The District is charged with "the control ... of the storm and flood waters, and the waters of the rivers and streams in Harris County and their tributaries for ... flood control ... and other useful purposes."[2] The Defendants contend their conduct in this case with respect to flood control was coextensive, and the homeowners do not argue otherwise.[3] The Harris County Commissioners Court is the governing body of the District.[4]

---

1. In addition to their inverse condemnation takings claim, the homeowners asserted a nuisance claim. The court of appeals held that because the homeowners had not invoked a separate waiver of governmental immunity in support of the nuisance claim, the claim was dependent on the takings claim in that the homeowners could only sue "for a nuisance that rises to the level of a constitutional taking." 445 S.W.3d 242, 254 (quoting City of Dallas v. Jennings, 142 S.W.3d 310, 312 (Tex.2004)). We agree with the court of appeals that "resolution of the [homeowners'] takings claim is equally dispositive with respect to their nuisance claim." Id. See also Jennings, 142 S.W.3d at 312 ("Because we conclude ... plaintiffs did not establish a constitutional taking ... the City has retained immunity from the plaintiffs' nuisance claim.").

2. Act of May 10, 1937, 45th Leg., R.S., ch. 360, § 1, 1937 Tex. Gen. Laws 714 (as amended).

3. Defendants present identical argument to us in combined briefing. Their briefing states that "[t]he District was the arm of the County that dealt with flood control," and at oral argument, counsel for Defendants stated that "the District really can't act without the County's approval. The County only acts in flood control through the District.... There may be different duties but in terms of their acts in this case they're absolutely coextensive."

4. Act of May 10, 1937, 45th Leg., R.S., ch. 360, § 1, 1937 Tex. Gen. Laws 714 (as amended).

Most of the homeowners' homes were built in the 1970s and early 1980s. Prior to the three flood events in issue, the homeowners' properties had suffered little or no flood damage, although the area has a long history of flooding. In 1976 the U.S. Army Corps of Engineers prepared an "Interim Report on Upper White Oak Bayou." The report was prepared for consideration by numerous federal and state entities including the District, the Cities of Houston and Jersey Village, and the Harris County Commissioners Court. The report noted recurring flooding in the upper White Oak Bayou drainage basin, an area covering 61 square miles, and described damaging flooding "occurring almost annually for the past several years." It stated that the flooding was "caused primarily by inadequate channel capacities of the streams," and that the problem was "compounded by continuing urbanization" of the fast-growing area. It predicted: "Additional residential development is expected to occur with or without an adequate plan for controlling the floods. Although current local regulations require that new structures be built above the level of the 100–year flood, damages will increase substantially in the future with increased rainfall runoff rates." It proposed "enlargement, rectification, and partial paving" of the bayou and tributaries, together with other flood-control measures. The plan was to be funded primarily by the federal government.

The County concurred with Corps' findings and agreed to act as a sponsor for the project, but federal funding was slow to materialize. The County approved new residential developments in the 1976–1984 period. The District began requiring new developments in the upper Bayou watershed to provide on-site detention ponds. The parties disagree on the extent to which the District deviated from this policy. The District eventually hired Pate Engineers to develop a flood-control plan, which was presented in a written report in 1984. The Pate Plan noted a "current policy requiring on-site stormwater detention on all new development projects in the Upper White Oak Bayou watershed," and proposed channel improvements combined with detention basins, with the goal of eliminating "the [100–year] flood plain in the upper portion of the watershed." The Plan stated that its implementation "should eliminate the existing flood plains through the existing developed portion of upper White Oak Bayou and provide for phased implementation of the ultimate plan to maintain 100–year flood protection on White Oak Bayou as future development occurs." In 1984, the County approved the Pate Plan and authorized the District to implement it. The Plan was to be funded through local taxes and impact fees, because federal funding was no longer available, and was to be implemented in phases. Developers who did not construct on-site detention facilities could pay an impact fee that would fund the construction of regional detention facilities.

The Pate Plan was never fully implemented, and flooding continued. In 1990 the District commissioned a new study by Klotz Associates to address flood concerns. The Klotz Plan called for measures that were different from the Pate Plan measures. The parties offer different characterizations of the shift from the Pate Plan to the Klotz Plan. The County contends that the Klotz Plan was necessary because assumptions in the Pate Plan proved wrong, and that the Klotz Plan was more ambitious than the Pate Plan. The homeowners contend that the Klotz Plan was less extensive than the Pate Plan for various reasons.

The homeowners claim that the flooding of their homes was caused by the County's approval of "unmitigated" upstream development, combined with a failure to fully

implement the Pate Plan.[5] Their expert, Larry Mays, relied on alleged unmitigated development occurring in the 1976–1990 time frame.[6]

The County filed a combined plea to the jurisdiction and motion for summary judgment, contending that no genuine issue of material fact had been raised on the elements of the takings claim. The trial court grudgingly denied the motion,[7] and the court of appeals affirmed.[8]

## B. Contentions of the Parties on Appeal

The parties raise many arguments. Briefly, the County contends the homeowners failed to raise a fact issue on the issues of intent, causation, and public use.

On intent, the County argues that it never intended to cause flood damage to the homeowners' properties. The County disputes that the evidence raised a fact

---

**5.** The homeowners had also alleged in the trial court that the County had worsened flooding by construction of a "control structure" or "dam" in White Oak Bayou, but they do not argue to us, and did not argue to the court of appeals, see 445 S.W.3d at 248 n. 2, that the structure contributed to the flooding of their properties. The homeowners' expert Larry Mays discussed the structure in his first expert report, but did not rely on it in his final report assessing the causes of the flooding and responding to criticisms of the County's experts. In an affidavit Mays attested that the control structure was built to ensure that the homeowners' neighborhoods "received no benefit" from a portion of the Pate Plan, but he did not attest that the completed portions of the Pate Plan and/or the Klotz Plan, including the control structure, made the flooding of the homeowners' properties worse than if the County had undertaken no flood-control efforts. He further clarified in his deposition that he did not believe the structure "was a causation of flooding for Jersey Village." To the extent the homeowners ever claimed that construction of the control structure was affirmative conduct actionable as a taking, we consider the claim abandoned.

**6.** The beginning of the time frame of the alleged unmitigated development is unclear. The County points out that, according to the homeowners' live petition, the County adopted the "Master Flood Control Plan," another name for the Pate Plan, in 1984, and "[p]rior to adoption of this Master Flood Control Plan, the [District] required all new development projects to incorporate on-site storm water detention into their development plans." The County characterizes this statement as a judicial admission. The homeowners disagree, and point out that Mays, in his final expert report, relied on developments approved without detention requirements af-

ter 1976. Regardless, the record is clear that the date the alleged unmitigated development *ended* was no later than 1990. Mays' first expert report on the 1998 Tropical Storm Francis flooding relied on a model of rainfall and runoff based on 1990 land use conditions, and asserted that "differences in flows that would result by updating to 1998 conditions are minimal." His second report, discussing the two later storms, asserted that "[t]he causations of flooding" of the two later storms "are the same as pointed out in my 2001 report for the Tropical Storm Francis." May also at least twice confirmed in his deposition that development after 1990 did not cause additional flooding, agreeing that "for those subdivisions that were developed between 1990 and 1998, you assumed that they did not contribute any additional flows into White Oak Bayou," and "it is fair to say that you have no evidence that development between 1990 and 1998 had any effect, any impact on the Plaintiffs' flooding in this case."

**7.** The trial court felt obliged, under the law of the case doctrine, to deny the motion based on an earlier court of appeals decision, but stated that it found the appellate decision "contradictory to Aristotle's Posterior Analytics in as much as the opinion fiats the presupposition that foreknowledge of possible future flooding is evidence of a forewill to take when a Governmental entity elects to expend its financial resources on other venues rather than proscriptively expending funds on the project at hand (a traditionally exempt exercise of legislative discretion—arguably thus the robbery victim may sue for funds spent upon fire prevention and home fire victim for funds spent upon police protection)."

**8.** 445 S.W.3d 242.

issue on whether the County was substantially certain that flooding would result from approval of development or failure to fully implement the Pate Plan. It argues that Mays' opinion regarding intent and causation is conclusory, suffers from analytical gaps, and therefore is not competent expert evidence.

On causation, the County contends that Mays opined that full implementation of the Pate Plan would have prevented flooding of the homeowners' properties, because the three floods were all less than the 100–year flood and the Pate Plan would have prevented flooding up to the 100–year event. The County contends Mays made no attempt to show, with scientifically reliable analysis, that full implementation of the Plan would have met this goal. The County offered evidence that assumptions in the Pate Plan became outdated, and argues that the Plan's goal of preventing flooding for anything less than a 100–year event was aspirational only. It points out that Mays, in his deposition, could not say that full implementation would have contained "the 100–year flood," only that "the intent of [the Pate Plan] was to contain" such a flood. The County also disputes that it ever authorized "unmitigated" development as described by Mays. It further complains of "Mays' failure to connect any particular unmitigated development to any particular flooded property."

On public use, the County argues that when, as here, property damage is merely the accidental result of the government's acts, there is no public benefit and the property is not taken or damaged for public use under the Texas Constitution. The County also argues there was no evidence the County consciously sacrificed the homeowners' properties for a perceived public use.

The homeowners respond to all of these arguments, contending that the trial court's denial of summary judgment on the takings claim was proper. They argue that the County's failure to fully implement the Pate Plan, combined with its approval of unmitigated development, resulted in flooding of their homes and amounted to a constitutional taking of their property. On the issue of intent, the homeowners contended in the trial court that Mays provided reliable expert testimony that unmitigated development "was substantially certain to result in increased flooding along the bayou in the vicinity of the Plaintiffs' properties." He claimed that, based on his analysis of the relevant data, the floods that damaged the homeowners' homes were not 100–year floods, and that full implementation of the Pate Plan would have prevented flooding of all properties not in the 100–year flood plain. He stated in the last of three expert reports: " 'But for' the actions by the County of approving this unmitigated development, and/or by not fully implementing the Pate Plan (which would have eliminated the risk of flooding along the bayou for up to a 100–year event), the Plaintiffs' properties would not have flooded during these three flood events." The homeowners contend that the affidavit of District Director David Talbott, submitted to negate the intent element, was conclusory and self-serving.

## II. Analysis

■ Where, as here, evidence is presented with a plea to the jurisdiction, the court reviews the relevant evidence and may rule on the plea as a matter of law if the evidence does not raise a fact issue on the jurisdictional question, a standard that generally mirrors the summary-judgment standard.[9]

9. *Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 227–28 (Tex.2004).

Our decision does not turn on an analysis of the reliability of expert testimony. Assuming all disputed facts in favor of the homeowners, the record is clear that the County never harbored a desire to cause flooding anywhere. Its motive was the opposite: it desired to prevent flooding and undertook extensive efforts over many years to accomplish this goal. Even under the most generous reading of the record, the County did not know which particular properties would flood. At most it was aware of a risk that properties in the White Oak watershed somewhere, someday would flood. Assuming that a cause of the flooding was the affirmative act of approving private development, there indisputably were other causes: heavy rainfall, and, according to the homeowners themselves, the failure to fully implement the flood-control measures of the Pate Plan. The confluence of these circumstances, in our view, does not give rise to a takings claim.

### A. General Principles of Takings Law and the Intent Element

Article I, section 17 of our Constitution provides:

No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person.[10]

■ Generally, plaintiffs seeking recovery for a taking must prove the government "intentionally took or damaged their property for public use, or was substantially certain that would be the result."[11] Sovereign immunity does not shield the government from liability for compensation under the takings clause.[12]

■ Much of our takings jurisprudence focuses on mens rea. We have made clear that a taking cannot be established by proof of mere negligent conduct by the government.[13] "[T]he requisite intent is present when a governmental entity knows that a specific act is causing identifiable harm or knows that the harm is substantially certain to result."[14]

### B. Other Elements of Takings Jurisprudence: Affirmative Conduct, Specificity, and Public Use

Much of the briefing focuses on the element of intent, but there are other elements of a taking that render the homeowners' claim problematic.

#### 1. Affirmative Conduct

■ Only affirmative conduct by the government will support a takings claim. We have always characterized a takings claim as based on some affirmative "act" or "action" of the government. For example, in *Gragg*, we held "that the requisite intent is present when a governmental entity knows that a specific *act* is causing identifiable harm...."[15] In *Gragg*, the

---

10. TEX. CONST. art. I, § 17(a).

11. *City of Keller v. Wilson*, 168 S.W.3d 802, 808 (Tex.2005).

12. *Gen. Servs. Comm'n v. Little–Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex.2001). For convenience, our references to "sovereign immunity" refer to the related doctrines of sovereign immunity and governmental immunity. *See City of Houston v. Williams*, 353 S.W.3d 128, 134 n. 5 (Tex.2011) (explaining that governmental immunity protects political subdivisions of the State).

13. *City of Tyler v. Likes*, 962 S.W.2d 489, 505 (Tex.1997).

14. *Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 555 (Tex.2004). *See also City of Dallas v. Jennings*, 142 S.W.3d 310, 314 (Tex. 2004).

15. 151 S.W.3d at 555 (emphasis added).

damage to the plaintiffs' ranch was caused by the water district's affirmative acts of constructing a reservoir and releasing water from the reservoir's floodgates.[16] Or as we stated in *Jennings*, "the parties agree that only an intentional act can give rise to such a taking.... There may well be times when a governmental entity is aware that its action will necessarily cause physical damage to certain private property, and yet determines that the benefit to the public outweighs the harm caused to that property."[17] A government cannot be liable for a taking if "it committed no intentional acts."[18] We have not recognized a takings claim for nonfeasance. The homeowners conceded this point in their briefing to the trial court, stating, "One of the elements of an 'inverse condemnation' case that a plaintiff must prove is that the government performed intentional act(s)." This element is important in today's case because the homeowners have consistently based their claim on the *failure* of the County to fully implement the Pate Plan, *combined with* its alleged approval of "unmitigated" private development. Mays' third expert report, for example, assigns two causes for the flooding: "[u]nmitigated land development, approved by the County," and "[f]ailure of the [District] to fully implement the 1984 Pate Plan." But the law does not recognize takings liability for a failure to complete the Pate Plan, despite the homeowners' attempt to somehow bundle that inaction with the affirmative conduct of approving development. Assuming all other elements are met, liability for the taking of the homeowners' properties can derive, if at all, from the County's affirmative acts of approving development.

## 2. Specificity

■ In addition, a specificity element runs through our jurisprudence. The caselaw indicates that in order to form the requisite intent, the government ordinarily knows which property it is taking. For example, *Jennings* describes the intent requirement as covering situations where "a governmental entity is aware that its action will necessarily cause physical damage to *certain* private property."[19] The government must know that "a *specific* act is causing *identifiable* harm" or know that "*specific property damage* is substantially certain to result from an authorized government action."[20] We have not recognized liability where the government only knows that someday, somewhere, its performance of a general governmental function, such as granting permits or approving plats, will result in damage to some unspecified parcel of land within its jurisdiction.

## 3. Public Use in this Anti–Regulatory Takings Case

This most certainly is not an ordinary regulatory takings case, one where the

---

16. *Id.* at 550, 552.

17. 142 S.W.3d at 314 (emphasis added). *See also id.* ("Our earlier jurisprudence has left open the possibility that liability may be predicated on damage that is necessarily an incident to, or necessarily a consequential result of, the *act*" of the governmental entity.") (emphasis added, internal quotation marks omitted); *State v. Hale*, 136 Tex. 29, 146 S.W.2d 731, 736 (1941) (holding that to be liable for a taking, the government must "*perform certain acts* in the exercise of its lawful authority ...

which resulted in the taking or damaging of plaintiffs' property") (emphasis added).

18. *Likes*, 962 S.W.2d at 505.

19. *Jennings*, 142 S.W.3d at 314 (emphasis added).

20. *Id.* (emphasis added); *accord City of San Antonio v. Pollock*, 284 S.W.3d 809, 821 (Tex. 2009).

plaintiff complains that the government through regulation so burdened his property as to deny him its economic value or unreasonably interfere with its use and enjoyment.[21] Today's case does not fit this body of takings jurisprudence and is in a sense its antithesis. First, the homeowners are not complaining about regulation of their property but regulation of other private properties. Second, the complaint is not excessive regulation, but insufficient regulation via the alleged approval of "unmitigated development." The homeowners similarly complain that in abandoning the Pate Plan the County did not regulate enough.

This uncharted theory should give us pause to ponder whether the claim, even if factually supported, is the stuff of a constitutional taking. If a private developer, after routine approval of its plat, uses its property in a manner causing damage to other properties, might the remedy lie against the developer rather than the county?[22] One can certainly argue that if the government's alleged affirmative conduct is nothing beyond allowing private developers to use their property as they wish, the more appropriate remedy is a claim against the private developers rather than a novel takings claim against the government. The homeowners in fact sued private developers and other private

parties, and neither side contends that remedies against such parties do not exist.[23]

One way of analyzing this question is through the element of public use. Article I, section 17 of our Constitution provides for compensation where the property is "taken, damaged or destroyed for or applied to public use." We have recognized that a taking may occur "if an injury results from either the construction of public works or their subsequent maintenance and operation,"[24] but we have not held that the public-use element is met where the government does nothing more than approve plats or building permits for private development.

The homeowners argue that the public-use element is met here because it was met in *City of Keller v. Wilson*. That case is factually distinguishable. In *City of Keller*, the city adopted a master drainage plan that called for a drainage easement on land belonging to the plaintiffs, the Wilsons.[25] The easement was to contain a ditch, and the plan originally called for the city to condemn 2.8 acres of the Wilson property for construction of the ditch.[26] The ditch would traverse the Wilson property and other properties and terminate in a creek.[27] Developers were required to comply with the plan, and built a ditch on

21. *See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 935 (Tex.1998) ("A compensable regulatory taking can also occur when the governmental agencies impose restrictions that either (1) deny landowners of all economically viable use of their property, or (2) unreasonably interfere with landowners' rights to use and enjoy their property.").

22. *See City of Keller*, 168 S.W.3d at 833 (O'Neill, J., concurring) (stating that review of subdivision plats "is intended to protect the city's residents; it is not intended to transfer responsibility for a flawed subdivision design from the developers to the municipality").

23. *See id.* at 835 (O'Neill, J., concurring) ("[W]hen a private development floods neighboring land, the owner of the damaged property will ordinarily have recourse against the private parties causing the damage.") (citing TEX. WATER CODE § 11.086).

24. *Likes*, 962 S.W.2d at 505.

25. 168 S.W.3d at 809.

26. *See City of Keller v. Wilson*, 86 S.W.3d 693, 702 (Tex.App.–Fort Worth 2002), *reversed*, 168 S.W.3d 802 (Tex.2005).

27. *Id.*; *City of Keller*, 168 S.W.3d at 808.

an adjacent property, the Sebastian property, but made no provision for a drainage easement across the Wilson property.[28] The city built a culvert to the creek, but it did not connect the ditch to the culvert as planned because neither the city nor the developers purchased an easement on the Wilson property, nor did they extend the ditch across the Wilson property as planned.[29] The result was that the Wilson property would flood when it rained.[30] Without analysis of the public-use element, we agreed with the court of appeals that this element had been satisfied,[31] but we ultimately held that the intent element had not been established, due to lack of "proof that the City knew the plans it approved were substantially certain to increase flooding on the" Wilson property.[32]

*City of Keller* is factually distinguishable because the city there planned to condemn an easement and build a ditch across the plaintiffs' property, knowing drainage across that specific property was part of the master plan. The jury found that the failure to build that leg of the ditch resulted in flooding on the Wilson property. As the court of appeals reasoned:

> Clearly, had the City used its powers of eminent domain to condemn a portion of the Wilson property for an easement, that use would have been a "public use" to implement the City's Master Drainage Plan. The fact that the City chose not to condemn any of the Wilson property and to instead, in violation of the

Plan, allow the water flowing from the Sebastian easement to discharge, uncontrolled, across the Wilson property shows that the invasion of the Wilson property by the water flowing from the Sebastian easement was for "public use."[33]

Hence, the public-use element as to the particular plaintiffs was not established merely by the approval of private development on other properties.[34] In today's case, there was no comparable proof that the County intended to purchase easements on the homeowners' particular properties and construct drainage facilities as part of a master plan, such that with or without such easements and drainage facilities runoff would under the plan traverse the homeowners' properties. The public-use element was more apparent in *City of Keller* because with or without the easement and ditch the plaintiffs' land would by city design be available to carry runoff to the creek. Similarly, in *Gragg*, the defendant water district denied that it had inversely condemned ranch property by releasing water through reservoir floodgates, but counterclaimed for a flowage easement if the court found that the property had been inversely condemned. The trial court granted such an easement on the portion of the ranch subject to flooding.[35] And in *Kopplow Development, Inc. v. City of San Antonio*, when the City decided to build a detention facility it "knew the project would inundate part of

---

28. *City of Keller,* 168 S.W.3d at 808.

29. *Id.*

30. *Id.*

31. *Id.* at 830.

32. *Id.*

33. *City of Keller,* 86 S.W.3d at 708.

34. The court of appeals expressly held that "the City's liability is not based merely on its approval of the developer's plans." *Id.* at 701 n. 2. *See also City of Keller,* 168 S.W.3d at 833 (O'Neill, J. concurring) ("[T]he City's mere approval of the private development plans did not result in a taking for public use, as the constitutional standard requires for a compensable taking.").

35. *Gragg,* 151 S.W.3d at 550.

[plaintiff] Kopplow's property before it ever began construction, prompting the City to seek a drainage easement from Kopplow."[36] In today's case, in contrast, whether viewed through the lens of intent or public use, there was no evidence that the County ever had designs on the homeowners' particular properties, and intended to use those properties to accomplish specific flood-control measures.

We also find the United States Supreme Court's landmark decision in *Kelo v. City of New London*[37] factually and legally distinguishable.[38] In *Kelo*, a city authorized a private nonprofit entity to condemn property as part of an economic revitalization plan.[39] The city claimed and the Court accepted that the public-use requirement was met because the plan would enhance the overall economic health of the community.[40] But *Kelo* was not an inverse condemnation case like today's case. There, the government, through an agent, condemned plaintiffs' properties for an alleged public purpose. Indisputably the plaintiffs' properties were taken from them by government action. In today's case, where the only affirmative conduct that allegedly damaged the homeowners' properties was the approval of private development, there is in our view a real question whether a taking by the government even occurred, that is, whether the homeowners' claim even belongs in the world of takings jurisprudence and is properly analyzed as a takings claim.[41] In *Kelo* the plaintiffs argued that there *was no* public use within the ambit of the federal Takings Clause, in hopes of disallowing the taking of their land. Here the homeowners are in a completely different posture, arguing that the approval of private development was undertaken for the benefit of the public at large, with the result that the homeowners' properties *were* damaged for a public use, so as to establish a taking within the ambit of the Texas Takings Clause. In light of these factual and legal distinctions, *Kelo* does not compel a result one way or the other in today's case.

The Washington Supreme Court considered a case similar to today's case where plaintiffs filed an inverse condemnation claim against a county, alleging that plaintiffs' property flooded after the county approved a development plat for a neighboring property. The court held that mere approval of the plat could not support a takings claim:

> If all the County had done was to approve private development, then one of the elements of an inverse condemnation claim, that the government has damaged the [plaintiffs'] property for a public purpose, would be missing. There is no public aspect when the County's only action is to approve a private development under then existing regulations. Furthermore, the effect of such automatic liability would have a completely

---

**36.** 399 S.W.3d 532, 537 (Tex.2013).

**37.** 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005).

**38.** *Kelo* was a federal takings case, but we have recognized that federal and Texas takings jurisprudence are generally consistent. *See Hearts Bluff Game Ranch, Inc. v. State,* 381 S.W.3d 468, 477 (Tex.2012); *Edwards Aquifer Auth. v. Day,* 369 S.W.3d 814, 838 (Tex.2012).

**39.** *Kelo,* 545 U.S. at 473–75, 125 S.Ct. 2655.

**40.** *Id.* at 483–84, 125 S.Ct. 2655.

**41.** We understand JUSTICE LEHRMANN's concurrence to urge that if a taking for public use is compensable, then surely a taking for private use would also be compensable. We agree. Our point here, however, is to question, under the rubric of public use, whether the Court should recognize that a taking even occurred under the facts of today's case.

unfair result.[42]

The approval of private development in this case—doing nothing more than allowing private parties to use their properties as they wish—presents at best a highly attenuated basis for meeting the public-use element of a takings claim.

## C. The Unavoidable Tension Between Takings Jurisprudence and Sovereign Immunity

While compensation to those whose property is taken for public use is an important and constitutionally imposed obligation of democratic government, governments must also be allowed to survive financially and carry out their public functions. They cannot be expected to insure against every misfortune occurring within their geographical boundaries, on the theory that they could have done more. No government could afford such obligations. Justices Jackson and Goldberg both recognized that the Bill of Rights is not a suicide pact.[43]

This Court has repeatedly, recently, and unanimously recognized that strong judicial protection for individual property rights is essential to "freedom

itself." [44] Locke deemed the preservation of property rights "[t]he great and chief end" of government,[45] a view we echoed almost 300 years later, calling it "one of the most important purposes of government." [46] Individual property rights are "a foundational liberty, not a contingent privilege." [47] They are, we reaffirm today, "fundamental, natural, inherent, inalienable, [and] not derived from the legislature," and "preexist[ ] even constitutions." [48]

But there is always tension between the compensation obligation of the Takings Clause and the necessary doctrine of sovereign immunity, also a doctrine of constitutional significance.[49] We long ago recognized that where government conduct caused damage to a plaintiff's property,

> One's normal reaction is that he should be compensated therefor. On the other hand, the doctrine of the non-suability of the state is grounded upon sound public policy. If the state were suable and liable for every tortious act of its agents, servants, and employees committed in the performance of their official duties, there would result a serious impairment of the public service and the necessary

42. *Phillips v. King Cnty.*, 136 Wash.2d 946, 968 P.2d 871, 878 (1998).

43. *Terminiello v. City of Chicago*, 337 U.S. 1, 37, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) (Jackson, J., dissenting) ("There is danger that, if the Court does not temper its doctrinaire logic with a little practical wisdom, it will convert the constitutional Bill of Rights into a suicide pact."); *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 160, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963) ("[W]hile the Constitution protects against invasions of individual rights, it is not a suicide pact.").

44. *Texas Rice Land Partners, Ltd. v. Denbury Green Pipeline–Texas, LLC*, 363 S.W.3d 192, 204 (Tex.2012).

45. John Locke, Second Treatise of Government, Chap. IX, Sec. 124 (C.B. MacPherson, ed., Hackett Publishing Co.1980) (1690).

46. *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140 (Tex.1977).

47. *Texas Rice Land Partners, Ltd.*, 363 S.W.3d at 204 n. 34.

48. *Id.* (quoting *Eggemeyer*, 554 S.W.2d at 140).

49. *See, e.g., Alden v. Maine*, 527 U.S. 706, 733, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) ("Although the sovereign immunity of the States derives at least in part from the common-law tradition, the structure and history of the Constitution make clear that the immunity exists today by constitutional design.").

administrative functions of government would be hampered.[50]

### D. Application of Takings Law to the Facts Presented

██ Because inaction cannot give rise to a taking, we cannot consider any alleged failure to take further steps to control flooding, such as the failure to complete the Pate Plan. Because a taking cannot be premised on negligent conduct, we must limit our consideration to affirmative conduct the County was substantially certain would cause flooding to the homeowners' properties and that would not have taken place otherwise. The only affirmative conduct on which the homeowners rely is the approval of *private* development. Further, the homeowners offered no proof that the County was substantially certain that the homeowners' particular properties would flood if the County approved new housing developments. The homeowners did not even assert such a claim, alleging instead that the County was substantially certain that its actions in approving "unmitigated development" would result in flooding "in the vicinity of Plaintiffs' properties." They never explained whether the "vicinity" is a few square miles or hundreds of square miles. They never identified precisely or even approximately the area of unmitigated development. The Pate Plan described the White Oak Bayou watershed as 110 square miles in size. The homeowners' expert Mays admitted that "I haven't been asked to do anything concerning specific plaintiffs." A County expert, Melvin Spinks, agreed that "Mays was unable to demonstrate that any actions of Defendants were the proximate cause of flooding of any particular Plaintiff's property," nor did Mays "determine the causation of flooding subdivision by subdivision." In the trial court, the County accurately described the homeowners' particular parcels as "scattered in a checker board fashion in the upper White Oak Bayou watershed, stretching several miles."

Further, the homeowners offered no evidence that the County was consciously aware that approval of unmitigated development in one defined area, such as a specific block or neighborhood, was substantially likely to cause flooding in another specifically defined area of the White Oak Bayou watershed that included the homeowners' properties. The County offered evidence to the contrary. District Director David Talbott attested that "[t]he District did not approve of land development knowing that there was inadequate stormwater runoff mitigation associated with a particular development," and pointed out that the District was tasked with addressing severe flooding problems not only in the White Oak Bayou watershed where the homeowners resided, but also in the Clear Creek, Greens Bayou, Cypress Creek, and Brays Bayou watersheds. While the homeowners number 400 who suffered flood damage during three events, Talbott pointed out that Tropical Storm Allison alone flooded 73,000 residences. Talbott and the vice president of Klotz both attested that it is against District policy to "move a flood"—sparing one neighborhood that would otherwise flood by causing another neighborhood to flood. Talbott also attested: "Although White Oak Bayou was always a high priority, with limited District funding the District also had to consider other high priority projects throughout the County. District funds that were available were allocated to various projects around the County, with White Oak Bayou receiving an appropriate share."

---

**50.** *Tex. Highway Dep't v. Weber*, 147 Tex. 628, 219 S.W.2d 70, 71–72 (1949).

This case is qualitatively different from recent cases like *Kopplow* and *Gragg* where we recognized a taking. In *Kopplow,* the city "knew the project would inundate part of [plaintiff] Kopplow's property" and sought a drainage easement from Kopplow, the city's project resulted in only one other property being placed below the 100–year flood plain, and the city obtained a drainage easement on that other property.[51] In *Gragg,* one of the flood-control district's experts acknowledged that his own modeling showed that higher than natural flooding would occur on the plaintiffs' particular ranch in 10 out of 16 floods, the district's records showed hundreds of releases by the district sufficient to cause flooding on the ranch, and there was evidence that the ranch had suffered "a large number of floods" after the district began the releases, whereas before the district's actions the ranch had never suffered from extensive flood damage.[52] In today's case, in contrast, the record is devoid of evidence the County knew, at the time it allegedly approved of "unmitigated" development, that the homeowners' particular properties would suffer from recurrent flooding. We recognized in *Jennings* that a taking occurs when property is "damaged for public use" in circumstances where "a governmental entity is aware that its action will necessarily cause physical damage to certain private property."[53] A conscious decision to damage certain private property for a public use is absent here.

The homeowners contend that *Kopplow* and *Gragg* are helpful to their case because both decisions recognized that the recurrence of flooding is probative on the issue of intent.[54] But we also held, in *City of San Antonio v. Pollock,* that when deciding intent in the takings context, "[t]he government's knowledge must be determined as of the time it acted, not with [the] benefit of hindsight."[55] This rule limits the persuasiveness of the homeowners' argument. The homeowners alleged in their petition that "[m]ost, if not all of the plaintiffs herein, had never flooded before September, 1998," the Tropical Storm Francis flooding and the first of three flood events about which they complain. Their recurrence argument to us is that "Plaintiffs' homes flooded three times in five years in 1998, 2001, and 2002." They contend these three floods are "probative evidence of intent under this Court's holdings in *Kopplow* and *Gragg.*" But their expert, Mays, opined that the unmitigated development that caused the flooding of their homes ended no later than 1990, years before the three flooding events.[56] The homeowners' recurrence argument is made with the benefit of hindsight.

 The determination of whether a taking has occurred is ultimately a question of law.[57] The determination is not formulaic given the legal and factual complexities sometimes presented, and may

---

**51.** *Kopplow,* 399 S.W.3d at 537–38.

**52.** *Gragg,* 151 S.W.3d at 550, 552.

**53.** 142 S.W.3d at 314.

**54.** *See Kopplow,* 399 S.W.3d at 537 (stating that "[w]ith flood water impacts, recurrence is a probative factor in assessing intent and the extent of the taking"); *Gragg,* 151 S.W.3d at 555 (stating that "[i]n the case of floodwater impacts, recurrence is a probative fac-

tor in determining the extent of the taking and whether it is necessarily incident to authorized government activity, and therefore substantially certain to occur").

**55.** 284 S.W.3d 809, 821 (Tex.2009).

**56.** *See supra* note 6.

**57.** *City of Austin v. Travis Cnty. Landfill Co.,* 73 S.W.3d 234, 241 (Tex.2002).

turn on the confluence of particular circumstances.[58] We hold that the homeowners have not presented a cognizable takings claim where (1) the County never desired to cause flooding, but desired only the opposite, (2) it undertook significant efforts to prevent flooding, spending tens of millions of dollars over many years, (3) the County never intended, as part of a flood-control plan, to use the homeowners' particular properties for detention ponds, drainage easements, or the like, (4) the only affirmative conduct allegedly causing the flooding was approval of private development, (5) the homeowners offered no proof that the County was substantially certain its approval of development would result in the flooding of the homeowners' particular lots, and (6) even by the homeowners' reckoning the flooding resulted from multiple causes—Acts of God,[59] the activities of other defendants,[60] the alleged failure to complete the Pate Plan, and the approval of private development. We have never recognized a takings claim under such attenuated circumstances. This is not a case where the government made a conscious decision to subject particular properties to inundation so that other properties would be spared, as happens when a government builds a flood-control dam knowing that certain properties will be flooded by the resulting reservoir. In such cases of course the government must compensate the owners who lose their land to the reservoir.

The homeowners' theory of takings liability would vastly and unwisely expand the liability of governmental entities, a view shared by the many public and private amicus curiae who have urged rehearing of this cause.[61] The theory lacks any discernible limiting principle and would ap-

---

**58.** For example, courts have recognized their inability to state a "set formula" for when regulatory takings occur. *Edwards Aquifer Auth.*, 369 S.W.3d at 839 (quoting *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)). "The [United States] Supreme Court has frequently noted that whether a particular property restriction is a taking depends largely upon the particular circumstances in that case." *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 477 (Tex.2012) (brackets, internal quotation marks omitted).

**59.** Their brief to us, for example, states the obvious: "Of course, without excessive rainfall no flooding would have occurred."

**60.** *See, e.g., Kerr v. Harris Cnty.*, 177 S.W.3d 290, 295 (Tex.App.–Houston [1st Dist.2005, no pet.) ("Plaintiffs also sued Jones & Carter, an engineering company involved in the development of Brookhollow subdivision, alleging that Jones & Carter 'was negligent in failing to provide for adequate storm water detention/retention facilities or in some other manner [to] adequately mitigate the increased storm water runoff created in conjunction with their developments in the White Oak Bayou watershed upstream of Plaintiffs' properties.'"); *Kerr v. Tex. Dep't of Transp.*, 45 S.W.3d 248, 249 (Tex.App.–Houston [1st Dist.] 2001, no pet.) ("Plaintiffs specifically pleaded that TxDot's construction of feeder lanes on Beltway 8 and reconstruction of portions of Highway 290 in the 1980s and 1990s increased stormwater runoff that 'detrimentally impacted' plaintiffs, who were downstream of these activities."). As noted above, the homeowners also sued municipal utility districts and private developers.

**61.** Amicus curiae urging rehearing include the National Association of Counties, City of Houston, Port of Houston Authority, Harris County Metropolitan Transit Authority, West Houston Association, Greater Houston Builders Association, Houston Real Estate Council, Fort Bend County, Texas Conference of Urban Counties, Texas Association of Counties, Texas Municipal League, County Judges and Commissioners Association of Texas, Texas Water Conservation Association, North Texas Tollway Authority, Jeff Davis County, El Paso County, City of Austin, Texas Department of Counties, Texas Department of Transportation, and City of San Antonio. The Houston Property Rights Association opposed rehearing.

pear to cover many scenarios where the government has no designs on a particular plaintiff's property, but only knows that somewhere, someday, its routine governmental operations will likely cause damage to some as yet unidentified private property. The homeowners' theory would apply to myriad property-damage claims and as to them might effectively abolish much traditional fault-based tort law, swallow much of sovereign immunity, and disrupt the carefully crafted waiver of immunity found in the Tort Claims Act. We have stated that sovereign immunity is universally recognized and fundamental to the nature and functioning of government, and that we leave it to the Legislature to make changes to that doctrine, as it has done in the Tort Claims Act.[62] Therefore, we think so sweeping an expansion of takings jurisprudence should be made only for the soundest reasons—reasons that escape us here—given the corresponding and massive contraction in the scope of sovereign immunity that would follow. While the right to compensation for a taking is constitutionally mandated, sovereign immunity is also a matter of constitutional significance.

The homeowners' notion of a taking is expansive indeed. Take, for example, a government such as the City of Austin that supplies electric utility service to its citizens. It surely knows that in running power lines throughout the service area, fires or other damaging events will occa-sionally occur when acts of nature knock down lines or poles. Witness the recent devastating fires in the Bastrop area allegedly caused by power lines. The government also surely knows that some private properties—those adjacent to the lines, or, in the homeowners' vernacular, "in the vicinity" of the lines, are especially vulnerable to such events. Under the homeowners' theory, an Act of God, such as a bolt of lightning, that causes a high-voltage line to topple or a transformer to blow, which in turn causes damage to a private property, is arguably a taking on the notion that properties near the grid have been sacrificed for the greater public good of providing electricity service to the whole community. Negligent maintenance of the utility grid is irrelevant, so long as the city is substantially certain that fires somewhere, someday, will occur along the grid, as surely is the case. It matters not that a storm contributed to the downed line, because in today's case storms also played an essential role. Traditional fault-based tort law, sovereign immunity, and the Tort Claims Act are irrelevant if the claim is framed as a taking. The hypothetical is arguably a stronger case for a taking than today's case, because providing an electric utility grid unquestionably involves a public use of property, whereas in today's case the only affirmative conduct allegedly resulting in a taking was granting approval of private development, perhaps not a public use at all.

---

**62.** We have noted that sovereign immunity is "inherent in the nature of sovereignty" and "an established principle of jurisprudence in all civilized nations." *Wichita Falls State Hosp. v. Taylor,* 106 S.W.3d 692, 695 (Tex. 2003) (quoting THE FEDERALIST No. 81, at 487 (Alexander Hamilton) (Clinton Rossiter ed., 1961), and *Beers v. Arkansas,* 61 U.S. 20 How. 527, 529, 15 L.Ed. 991 (1857)). "We have held ... that the Legislature is better suited to balance the conflicting policy issues associated with waiving immunity." *Id. See* also *Tex. Natural Res. Conservation Comm'n v. IT–Davy,* 74 S.W.3d 849, 854 (Tex.2002) ("We have consistently deferred to the Legislature to waive sovereign immunity from suit, because this allows the Legislature to protect its policymaking function."); *Guillory v. Port of Houston Auth.,* 845 S.W.2d 812, 813 (Tex. 1993) ("Since the Tort Claims Act was passed in 1969, we have repeatedly held that the waiver of governmental immunity is a matter addressed to the Legislature.") (internal quotation marks omitted).

Or take any large city, school district, or other governmental entity that has a fleet of vehicles. The government surely knows its vehicles regularly have accidents causing damage to private property. The government also surely knows that collisions will occur more frequently in certain areas, such as along bus routes or near the garbage truck depot, school bus lot, etc., where the government's vehicular traffic is concentrated. Under the homeowners' theory, each accident resulting in damage to private property in a higher-risk area would appear to be a compensable taking, again on the theory that this property has been sacrificed for the greater good of providing city-wide public transportation. The claim is arguably stronger than the claim in today's case, because (1) there is no Act of God that can be assigned at least part of the causation, (2) the city in the hypothetical is not just substantially certain but absolutely certain that accidents will occur, and (3) providing a city bus system is unquestionably a public use of property, unlike approval of private plats. No need to prove negligence on the city's part; the intent element is met because the city is substantially certain that accidents happen. No need to predict exactly where the accidents will occur, because in today's case the homeowners never contended or offered proof that the County formed any intent with respect to their particular properties. The homeowners' expert on the intent element conceded, "I haven't been asked to do anything concerning specific plaintiffs."

Amicus curiae Texas Department of Transportation (TxDOT) raises a similar hypothetical. It points out that it is required by law, in determining roadway access, to balance "the needs of mobility and safety on a highway system with the needs of access to adjacent land uses." [63]

In its own access policy manual, it recognizes that numerous studies have shown that "[a]s access density increases, crash rates increase." Thus, according to TxDOT, it "knows that the issuance of driveway access permits onto State roadways will result in more accidents, inevitably causing damage to as yet unidentified private property. Arguably, under the homeowners' theory, every accident resulting in damage to private property may be a compensable taking on the theory that the property has been sacrificed for the greater good of providing property owners and their customers or residents access to roadways."

Or take any large city with its contingent of high-rise buildings. A city may know that somewhere, someday, a fire will occur on a floor the city fire trucks cannot reach. Suppose a city has a study in hand recommending larger ladder trucks, but fails to purchase the trucks due to funding problems or other priorities. Under the homeowners' approach, if a fire occurs on a higher floor of a building, and damages adjacent properties, the adjacent property owners have a takings claim if they can show that a larger ladder truck would have contained the fire. It does not matter whether the city's conduct was reasonable given its tax base or funding priorities. In today's case, too, the record shows that funding issues played a role in the County's decisions. All that matters is that the city issued building permits, knowing that somewhere, someday, a fire would likely occur on an upper floor. This knowledge supplies the intent element, and the building permits supply the causation element, regardless of whether an act of nature started the fire. It does not matter whether the building in issue was privately owned, because according to the home-

---

63. 43 Tex. Admin. Code § 11.50(a).

owners private ownership of the property approved for development is no bar to recovery.

Amicus Curiae Harris County Metropolitan Transit Authority (METRO) imagines an even more disturbing hypothetical, asking whether hurricanes allegedly caused by global warming would be a compensable taking under the homeowners' reasoning. After all, METRO contends, "Experts can be hired who will testify that burning fossil fuels raises sea levels and makes storms more intense. Yet governments issue permits allowing exploration and production of fossil fuels, and construction and operation of the power plants that burn them."

And, as several amici curiae fear in urging rehearing, the homeowners' theory of takings would place governments in a unending dilemma of requiring extreme flood-control measures and facing a regulatory takings claim from the owners directly subjected to such measures, or requiring less extensive measures and facing a takings claim when downstream property owners experience flooding. In the words of amicus curiae City of San Antonio, flood-control decisions will be reduced to "picking your plaintiff rather than responsible flood control management."

We decline to extend takings liability vastly beyond the extant jurisprudence, in a manner that makes the government an insurer for all manner of natural disasters and inevitable man-made accidents.[64] Holding otherwise would encourage governments to do nothing to prevent flooding, instead of studying and addressing the problem. The homeowners do not urge

the existence of a general legal duty on the part of the County to prevent flooding, breach of which would give rise to a private cause of action. Their claim instead is that the County failed to complete the Pate Plan and approved private development, behavior allegedly resulting in a taking of their properties. If various state and federal governmental entities had not commissioned and conducted detailed studies of regional flooding, the homeowners would have no basis for contending that the County was substantially certain of the link between development and flooding, and would not be able to use that knowledge against the County. If the County had undertaken no efforts to control flooding, the homeowners could not assert the failure to complete the Pate Plan as a basis for liability. Further, by framing their claim as a constitutional taking, the homeowners have asserted a claim unbounded by any statutory caps on compensatory damages the Legislature might otherwise impose. Accepting such a capacious approach to takings would endanger the ability of governments to finance and carry out their necessary functions, the basis for sovereign immunity.

## III. Conclusion

The plea to the jurisdiction was well-taken and should have been granted. We reverse the judgment of the court of appeals and render judgment dismissing the case.

JUSTICE LEHRMANN filed a concurring opinion.

---

64. See Phillips v. King Cnty., 136 Wash.2d 946, 968 P.2d 871, 878 (1998) (holding that county is not liable for a taking if it only approves a private development plat, and stating: "If the county or city were liable for the negligence of a private developer, based on approval under existing regulations, then the municipalities, and ultimately the taxpayers, would become the guarantors or insurers for the actions of private developers whose development damages neighboring properties.").

JUSTICE DEVINE filed a dissenting opinion, in which CHIEF JUSTICE HECHT, JUSTICE GREEN, and JUSTICE BOYD joined.

JUSTICE LEHRMANN, concurring.

"[A]ware of the tendency of power to degenerate into abuse," Thomas Jefferson said that "our own country [has] secured its independence by the establishment of a constitution and form of government for our nation, calculated to prevent as well as to correct abuse." 8 THOMAS JEFFERSON, *To the Tammany Society of Columbian Order of the City of Washington (March 2, 1809), in* THE WRITINGS OF THOMAS JEFFERSON 156, 156–57 (1854). Recognizing the same need to set in stone the limits on government's capacity to invade certain essential rights, "Texans have adopted state constitutions to restrict governmental power." *Vinson v. Burgess*, 773 S.W.2d 263, 267 (Tex.1989). In that sense, the constitutional bedrock underlying and supporting Texas's legal system assumes both the possibility that the government will abuse its authority and the wisdom of curtailing that abuse from the outset.

To that end, Article I, section 17 of the Texas Constitution contains an important limitation on the government's authority to invade Texans' property rights, providing that "[n]o person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made." In this case, the plaintiffs contend that the government took their property without compensation by approving private development that resulted in the flooding of their homes. I agree with the Court that the circumstances of this case do not give rise to a cognizable takings claim and join the Court's opinion in full. I write separately to call attention to the Court's recognition that "if a taking for public use is compensable, then surely a taking for private use would also be com-

pensable." *Ante* at 803 n. 41. While not crucial to the dispute at hand, this point warrants further discussion.

In compliance with Article I, section 17's restrictive mandate, we have consistently held that the State must justify its exercise of eminent domain by establishing the taking is for public use. *See, e.g., City of Austin v. Whittington*, 384 S.W.3d 766, 772 (Tex.2012); *Davis v. City of Lubbock*, 160 Tex. 38, 326 S.W.2d 699, 702–03 (1959). And quoting that same constitutional language—perhaps carelessly—we have also stated that an aggrieved property owner's claim for inverse condemnation is predicated on a showing that the government "intentionally took or damaged [private] property for public use, or was substantially certain that would be the result." *City of Keller v. Wilson*, 168 S.W.3d 802, 808 (Tex.2005); *see also State v. Hale*, 136 Tex. 29, 146 S.W.2d 731, 736 (1941); *Gulf, C. & S.F. Ry. Co. v. Donahoo*, 59 Tex. 128, 133 (1883). But we have never held that a taking that fails to satisfy the public-use element is not compensable. To the contrary, we have broadly held that when "the government takes private property without first paying for it, the owner may recover damages for inverse condemnation." *Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 554 (Tex.2004). Our inclusion of "public use" as an element of an inverse-condemnation claim—stated with no analysis in cases in which public use was not even at issue—should not be read to imply that an inverse-condemnation claimant would not be entitled to compensation if property were taken for private use or the public-use requirement were not satisfied. *See, e.g., City of Keller*, 168 S.W.3d at 808.

Moreover, the Court has explicitly addressed the propriety (or rather, the impropriety) of a private-use taking within other contexts. We did so with greatest

clarity in *Maher v. Lasater*, 163 Tex. 356, 354 S.W.2d 923 (1962). In that case, a property owner challenged the constitutionality of a commissioners court's order declaring a private road to be a public highway. *Id.* at 924. The order was issued pursuant to a statute that permitted such a declaration if a road was deemed "of sufficient public importance." *Id.* at 925. The road at issue traversed the plaintiff's property from a public road and terminated at the boundary of his neighbor's land, which was used for grazing and pasturing. *Id.* at 924. As the road allowed access solely to the neighbor's land, the only public purpose served was "putting the products of the soil and the range of [the neighboring property] into the economy of the community." *Id.* at 926. As such, we held that the commissioners court's declaration violated the public-use requirement of the Texas Constitution's Takings Clause, and that the taking was void because it was not of sufficient public importance.[1] *Id.* Implicit in this holding is a recognition that a taking for a private purpose would also be void.

But this precedent does not clearly address whether an inverse-condemnation plaintiff is entitled to compensation for a private taking. Unlike *Maher*, in which the government's declaration that the plaintiff's property was no longer private was declared void, in this case the County cannot undo the water damage to the plaintiffs' homes. The proverbial bell has been rung. *Maher* addresses what Texas courts should do when title to property is taken outright for private use, but it fails to suggest a solution when a taking for private use damages property and reduces its value.

The need for this Court to address the compensability of a private taking is particularly important in Texas because such a taking is a real possibility. *See Osburn v. Denton Cty.*, 124 S.W.3d 289, 293 (Tex. App.–Fort Worth 2003, pet. denied) (holding that a private-use taking did not warrant compensation). By contrast, private takings are ostensibly a non-issue under the federal Constitution. The Sixth Circuit has stated that "[e]xamples of a taking for a private use tend to be esoteric . . . because all that is required for the taking to be considered for public use is a rational relationship to some conceivable public purpose." *Montgomery v. Carter Cty., Tenn.*, 226 F.3d 758, 765 (6th Cir.2000). As such, "[v]ery few takings will fail to satisfy that standard." *Id.* at 765–66. The Seventh Circuit has similarly characterized the burden of establishing a public use as "remarkably light." *Daniels v. Area Plan Comm'n of Allen Cty.*, 306 F.3d 445, 460 (7th Cir.2002).[2] That low bar was confirmed by the U.S. Supreme Court's ruling in *Kelo v. City of New London* that a taking "for public use" need only serve a public purpose. 545 U.S. 469, 480, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005). As a result, the Court held that taking private property for the purpose of turning it over to private developers pursuant to a "carefully formulated . . . economic development plan" satisfied the public-use requirement

---

1. This decision fits squarely with the U.S. Supreme Court's view. *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 245, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984) ("A purely private taking could not withstand the scrutiny of the public[-]use requirement; it would serve no legitimate purpose of government and would thus be void.").

2. However, the burden is not insurmountable. Federal courts on occasion have enjoined condemnation proceedings on federal constitutional grounds because the purported reason for the proposed taking did not satisfy the public-use requirement. *See, e.g., 99 Cents Only Stores v. Lancaster Redevelopment Agency*, 237 F.Supp.2d 1123, 1130–31 (C.D.Cal. 2001).

of the U.S. Constitution's Takings Clause. *Id.* at 483, 125 S.Ct. 2655.

In what has widely been viewed as a response to *Kelo,* the Texas Legislature passed the Limitations on Use of Eminent Domain Act during a 2005 special session. Act of Aug. 16, 2005, 79th Leg., 2d C.S., ch. 1, § 1, 2005 Tex. Gen. Laws 1, 1–2; *see also W. Seafood Co. v. United States,* 202 Fed.Appx. 670, 677 (5th Cir.2006) (noting that the Act was passed in response to the *Kelo* decision). Codified as Texas Government Code section 2206.001, the Act precludes a government taking that (1) would confer "a private benefit on a particular private party through the use of the property," (2) was "merely a pretext to confer a private benefit," or (3) served purely "economic development purposes." The Act was amended in 2011 to make clear that the government may not condemn property if it "is not for a public use." Act of May 6, 2011, 82d Leg., R.S., ch. 81, § 2, sec. 2206.001, 2011 Tex. Gen. Laws 354, 354.

These provisions are aimed squarely at the federal courts' deferential approach to the public-use requirement. The Legislature has clearly exercised its prerogative to protect Texans' property rights by narrowly defining public use. As a result, government actions that satisfy the federal public-use requirements could very well fail to satisfy such requirements in Texas. Because the Texas Legislature has opted to give greater protection to individual property rights, any suggestion that a private-use taking might bar a property owner's right to recovery is misplaced. The Constitution limits government power; it does not limit Texans' rights to obtain appropriate relief when that power is exceeded.

Although a few cases from other jurisdictions addressing those states' constitutions have held that a taking for private use is not compensable, I find the reasoning in these cases unpersuasive. *E.g., Clark v. Asheville Contracting Co.,* 316 N.C. 475, 342 S.E.2d 832, 839 (1986); *Tulare Irrigation Dist. v. Lindsay–Strathmore Irrigation Dist.,* 3 Cal.2d 489,45 P.2d 972, 990 (1935). Such a holding improperly infers from the constitutionally placed burden on the government a reciprocal burden on property owners. Just as crucially, however, it ignores the Texas Constitution's goal of anticipating and preventing potentially abusive government action. Declaring that a private-use taking is not compensable would create a perverse set of incentives for State actors by encouraging takings that do not serve a public use. In turn, a public shield against improper government action would be converted into a sword to enable that same improper action. Put simply, it makes no sense to say that a property owner is entitled to compensation if the government does the right thing but not if it does the wrong thing.[3]

With these additional thoughts, I join the Court's opinion and judgment.

JUSTICE DEVINE delivered a dissenting opinion, in which CHIEF JUSTICE HECHT, JUSTICE GREEN, and JUSTICE BOYD joined.

This inverse condemnation case concerns whether homeowners raised a fact

---

**3.** Such a conclusion would leave property owners injured by a private taking with little recourse, as sovereign immunity would bar alternative tort claims against the government. While ultra vires actions against a government official who acts without legal authority allow prospective relief; they offer little solace to a property owner faced with repairing damage that has already occurred. See *City of El Paso v. Heinrich,* 284 S.W.3d 366, 373–77 (Tex. 2009) (discussing the strictly prospective nature of the relief in an ultra vires action).

question as to the elements of a taking. The homeowners blame their county and flood control district for approving new development without mitigating resulting runoff and drainage issues, causing their homes to flood. Of course, government entities do not have a duty to prevent all flooding. But, because the homeowners here presented evidence that the government entities knew unmitigated development would lead to flooding, that they approved development without appropriately mitigating it, and that this caused the flooding, I believe that the homeowners have raised a fact issue as to their takings claim. Because the Court concludes otherwise, I respectfully dissent.

## I. Background and Procedural History

The plaintiffs in this case are more than 400 residents and homeowners in the upper White Oak Bayou watershed in Harris County. Their homes were built mostly in the mid-to-late 1970s and early 1980s. Despite a history of flooding in the area, they initially suffered little to no flood damage. This changed, however, when Tropical Storm Francis in 1998, Tropical Storm Allison in 2001, and an unnamed storm in 2002 flooded their homes one or more times. The homeowners blame Harris County and Harris County Flood Control District, asserting that they approved new upstream development without implementing appropriate flood-control measures, all the while being substantially certain flooding would result.

The government entities have long known that expanding development in the watershed could cause flooding. In 1976, the U.S. Army Corps of Engineers prepared a report on the upper White Oak Bayou. The report noted recurrent damaging floods, which it attributed primarily to "inadequate channel capacities of the streams." This problem was "compounded by the continuing increases in suburban development which reduces the infiltration of rainfall and increases and accelerates runoff to the streams." Inadequate street drainage and storm sewers also caused severe localized flooding. The report predicted: "Additional residential development is expected to occur with or without an adequate plan for controlling the floods. Although current local regulations require that new structures be built above the level of the 100–year flood, damages will increase substantially in the future with increased rainfall runoff rates." Accordingly, the Corps proposed channel improvements and other changes to reduce flooding caused by existing and future development. The plan was to be funded primarily by the federal government.

The government entities concurred with the Corps' findings and agreed to facilitate the project. Their ostensible goal following the Corps' report was to maintain or reduce the bayou's 100–year flood plain. But federal funding was slow to materialize, even as thousands of acres were developed in the bayou's watershed and the County continued approving more. Construction in the 100–year flood plain had been prohibited since the early 1970s, meaning that almost none of the new development or the plaintiffs' homes were in the 100–year flood plain when built or approved.

The delay in federal funding for the Corps' plan led County officials to develop their own flood-control plan. The District had already begun requiring new developments in the upper part of the watershed to provide on-site detention ponds, though the parties disagree on whether the District deviated from this policy. The government entities commissioned Pate Engineers to develop a plan. The "Pate Plan," adopted by the County in 1984, proposed to eliminate flooding along the upper bay-

ou for 100–year flood events. Like the Corps' plan, the Pate Plan called for channel improvements along the upper portion of the bayou (some near the plaintiffs' homes). But it also called for more, such as for regional detention ponds to mitigate continuing development in the upper watershed. The plan was to be funded through local taxes and impact fees, but it was never fully implemented.

A 1989 flood led residents to inquire about the flood-control measures. The District's director assured them of plans to protect their property from 100–year floods. Yet the 1989 flood revealed flaws in the Pate Plan's engineering analysis, and the District commissioned another report on the upper White Oak Bayou watershed. Klotz Associates presented their findings in the early 1990s, concluding that the Pate Plan seriously underestimated the bayou's flood flows and levels. Though the Klotz Plan's features were more extensive in some regards than the Pate Plan, the Klotz Plan was modeled around containing 10–year (as opposed to 100–year) flood events. The government entities adopted these changes.

The new information led FEMA to update the bayou's flood-plain maps in the 1990s. Revisions exposed an expanding flood plain, encompassing more and more of the plaintiffs' homes. According to the homeowners, by 1999, all of their homes were within the 100–year flood plain— something the government entities do not dispute here. Indeed, from 1998 to 2002, most of their homes were inundated in three successive floods.

The homeowners filed an inverse condemnation suit. The government entities responded with a combined plea to the

jurisdiction and motion for summary judgment, contending that no genuine issue of material fact had been raised on the elements of the takings claim. The trial court denied the motion, and the court of appeals affirmed the denial of the plea to the jurisdiction. 445 S.W.3d 242, 247 (Tex. App.–Houston [1st Dist.] 2013).

## II. Analysis

Article I, Section 17 of the Texas Constitution provides:

> No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person . . . .

TEX. CONST. art. I, § 17(a).

Those seeking recovery for a taking must prove the government "intentionally took or damaged their property for public use, or was substantially certain that would be the result." *City of Keller v. Wilson,* 168 S.W.3d 802, 808 (Tex.2005). Sovereign immunity does not shield the government from liability for compensation under the takings clause. *Gen. Servs. Comm'n v. Little–Tex Insulation Co.,* 39 S.W.3d 591, 598 (Tex.2001).[1] To defeat the government entities' plea to the jurisdiction, the homeowners need only raise a fact issue as to each element of their claim. *See Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 228 (Tex.2004) (noting that plea to the jurisdiction procedure "mirrors" our summary judgment practice). That is, the homeowners must raise a fact issue as to intent, causation, and public use. *Little–Tex Insulation Co.,* 39 S.W.3d at 598. While determining whether they have met this burden, we

---

1. For convenience, I use "sovereign immunity" throughout this opinion to refer to the related doctrines of sovereign immunity and governmental immunity. *See City of Houston v. Williams,* 353 S.W.3d 128, 134 n.5 (Tex. 2011) (explaining that governmental immunity protects political subdivisions of the State).

take as true all evidence favorable to the nonmovant, indulging every reasonable inference and resolving any doubts in the nonmovant's favor. *Miranda,* 133 S.W.3d at 228.

### A. Intent

In a takings case, "the requisite intent is present when a governmental entity knows that a specific act is causing identifiable harm or knows that the harm is substantially certain to result." *Tarrant Reg'l Water Dist. v. Gragg,* 151 S.W.3d 546, 555 (Tex.2004). It is not enough that the act causing the harm be intentional—there must also be knowledge to a substantial certainty that the harm will occur. *City of Dallas v. Jennings,* 142 S.W.3d 310, 313–14 (Tex.2004). Intent, in takings cases as in other contexts, may be proven by circumstantial evidence. *See Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 435 (Tex.1986). But a taking cannot rest on the mere negligence of the government. *City of Tyler v. Likes,* 962 S.W.2d 489, 505 (Tex.1997). The issue here is whether the homeowners' circumstantial evidence raises a fact question as to the government entities' knowledge that "harm [was] substantially certain to result" to the homeowners' homes because of the entities' actions. *See Gragg,* 151 S.W.3d at 555.

The homeowners do not argue that the government entities have a general legal duty to prevent all flooding. Instead, they urge that the entities approved private development in the White Oak Bayou watershed without mitigating its consequences, being substantially certain the unmitigated development would bring flooding with it. The government entities respond that they did not intend the flooding; indeed, the District's very purpose is to plan for storm-water runoff and control flooding. They assert that they cannot stop all flooding, and to the extent flooding does occur, their intent is to reduce or prevent it, not cause it.

The summary judgment evidence shows a fact question exists regarding whether the government entities were substantially certain their actions in approving development without appropriately mitigating it would cause the plaintiffs' homes to flood. The Corps' report, Pate Plan, and Klotz report confirm that the entities have known for several decades that development in the bayou's watershed exacerbates flooding in the upper bayou. The homeowners point to evidence that the County approved development without the previously required on-site detention.[2] The Klotz report led the entities to plan for 10–

---

**2.** The government entities note that the homeowners' pleadings specifically blamed flooding on development "[s]ince 1984." The pleadings stated that prior to 1984, the District "required all new development projects to incorporate on-site storm water detention into their development plans." The entities assert that the homeowners judicially admitted that on-site detention accompanied all pre-1984 development. A judicial admission, however, must be clear and unequivocal. *See Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 905 (Tex.2000). A possible interpretation of the homeowners' pleadings is that the District had a requirement of on-site detention, but this says nothing about the District's adherence to that requirement. In-

deed, the homeowners' response to the entities' plea to the jurisdiction and summary judgment motion specifically claimed that "Defendants continued to approve new development without on-site mitigation even after this 1976 study had clearly shown them that the bayou did not have the capacity to handle any additional storm water runoff." As evidence that some pre–1984 development was not mitigated, the homeowners rely on a table supplied by the entities' expert, Melvin Spinks. The parties interpret the table differently, and the table itself is not clear on its face, but the homeowners' pleadings do not contain an unequivocal admission on the subject.

year flood events rather than 100–year floods as called for by the Pate Plan. And the homeowners' expert witness, Dr. Larry Mays, opined that when the entities approved development, knowing that surface runoff would increase if the development was not mitigated, and then planned to contain only 10–year floods, the entities were substantially certain that flooding would result.

The government entities respond that their "knowledge must be determined as of the time [they] acted, not with benefit of hindsight." *City of San Antonio v. Pollock,* 284 S.W.3d 809, 821 (Tex.2009). The entities urge that they changed from the Pate Plan to the Klotz Plan because the Pate Plan was flawed. There is no evidence they knew of the flaws at the time they adopted it or approved most of the development. In other words, no evidence exists that at the time they approved most of the development at issue, they were substantially certain the flood-control measures would fail and flooding would result. When the 1989 flood revealed the Pate Plan's flaws, the entities followed their engineers' advice and adopted the Klotz Plan. Since then, they have spent millions of dollars on drainage and infrastructure that, according to their experts, goes far beyond the Pate Plan, and no evidence exists that the Pate Plan would have stopped the floods the homeowners complain about. Michael David Talbott, an expert witness for the entities, explained that the District's knowledge of the watershed "changed significantly over time" and continued to change "with the advent of new technologies and with observations of actual events." The changing flood plains and changing plans were not premeditated; they resulted from new data and knowledge.

This competing evidence demonstrates, in the words of the court of appeals below,

"the factual complexity surrounding this issue and the difficulty of pinpointing precisely what [the government entities] knew about flooding in the upper watershed and when they knew it." 445 S.W.3d at 258. Evidence exists that the entities approved development without appropriately mitigating it, and that at times they deviated from their early policy of requiring on-site detention ponds. There is also evidence that they abandoned plans protecting against 100–year floods for plans targeting only 10–year floods. Though none of the evidence on its own might raise a fact question, together it raises a question of fact as to the entities' intent to take the homeowners' property to facilitate new development without appropriate mitigation.

The homeowners also submit that the recurring nature of these floods is probative of the government entities' intent and the extent of the taking. *See Gragg,* 151 S.W.3d at 555 ("In the case of flood-water impacts, recurrence is a probative factor in determining the extent of the taking and whether it is necessarily incident to authorized government activity, and therefore substantially certain to occur."); *see also Kopplow Dev., Inc. v. City of San Antonio,* 399 S.W.3d 532, 537 (Tex.2013) ("With flood water impacts, recurrence is a probative factor in assessing intent and the extent of the taking."). Here, the entities knew that flooding occurred frequently in the bayou, and they originally planned for 100–year events. Yet there is evidence that they later planned only for 10–year events. The fact that storms sometimes surpass 10–year events is no surprise to the entities. The recurring nature of the flood events is evidence of intent and the extent of the taking.

The government entities invoke *City of Keller v. Wilson,* where the Court held that a city could rely on engineers' conclusions that a drainage ditch was unneces-

sary, even though, as it turned out, the ditch might have stopped flooding. *See* 168 S.W.3d at 829. Here, the entities did receive engineers' advice. Yet the entities were also aware that the Klotz Plan would protect against 10–year events, whereas the prior plan had been to protect against 100–year floods. There is evidence the entities knew (based, in part, on engineers' reports) that unmitigated development would lead to flooding. Unlike in *City of Keller*, the engineers' recommendations here informed the entities of the danger.

In sum, the homeowners have raised a fact question regarding intent. This case is unlike others where there was no "evidence that the act ... was substantially certain to lead to such damage." *Jennings*, 142 S.W.3d at 315.

### B. Causation

To prevail, the homeowners must also raise a fact issue as to whether the government entities' actions "resulted in a 'taking' of property." *Little–Tex Insulation Co.*, 39 S.W.3d at 598. The entities assert that the homeowners failed to do so. I disagree.

The homeowners' expert, Dr. Mays, performed a study that raises a fact question regarding whether the government entities' approval of development and subsequent failure to properly mitigate it caused the homes to flood. Dr. Mays investigated the effects of unmitigated development on the watershed, performing his "Effect of Urbanization on Peak Discharges" analysis to demonstrate the difference between 1982 land use conditions and 1990 land use conditions. He compared peak discharges and runoff hydrographs from conditions in 1982 to peak discharges and runoff hydrographs from conditions in 1998, concluding that the primary cause of flooding along White Oak Bayou was development "without the implementation of proper storm-water management measures (such as detention and/or retention)." This caused "significant increases in flows and corresponding water surface elevations for an approximate 10–year flood event." Dr. Mays determined that two of the three flood events between 1998 and 2002 were 10–year flood events. He concluded: "But for the actions by the County of approving this unmitigated development, and/or by not fully implementing the Pate Plan (which would have eliminated the risk of flooding along the bayou for up to a 100–year event), the Plaintiffs' properties would not have flooded during these three flood events."

The government entities point to purported "analytical gaps" in Dr. Mays' study. For example, the entities point out that Dr. Mays freely admitted that he never modeled or tested the Pate Plan to show that it would have stopped the flooding. Without proving there was a way to stop the flooding, Dr. Mays could not prove the entities caused it. The entities present evidence that the expanding flood plain was caused (at least in part) by new knowledge about existing conditions as opposed to changes in conditions. The entities assert that intense, unexpected rainfall—not their own actions—caused the floods, observing that flooding occurred all over Harris County during these storms, not just in the White Oak Bayou watershed. They also challenge Dr. Mays' method of determining the size of the storms, arguing that they were larger.

I believe the homeowners have raised a fact issue regarding whether the entities' actions caused the flooding. The homeowners presented evidence that the Klotz Plan targeted 10–year events, whereas the Pate Plan had aspired to contain 100–year floods. Dr. Mays presented data supporting his conclusion that the flooding was caused by water exceeding the bounds of

the bayou rather than by the pooling of water in the homeowners' yards. Regarding the size of the flood events, the entities' own expert, Andy Yung, created a fact issue. In an affidavit, Yung stated that the rainfall for the 2001 storm exceeded a 100–year event. But in a report, he concluded that the 1998 and 2001 floods were about 50–year events and the "magnitude of the 2002 flood event was considerably less." He then concluded that "in all three of these events, areas were inundated which have been historically identified in the 100–year flood plain." In other words, the entities' own expert provides evidence that the floods were less than 100–year events, but that the flooding extended into areas not anticipated even for 100–year events. A fact question exists regarding the cause of the floods.

In sum, several unresolved fact questions exist. For example, the parties dispute the nature and degree of the three flood events. The government entities have contended that two of the storms produced unprecedented rainfall, yet evidence exists that these storms were within the parameters planned for by the Pate Plan and the Corps' study. The parties also dispute the degree to which unmitigated development contributed to the 100–year flood plain's expansion, the relative benefits and shortcomings of the Pate and Klotz Plans, and the entities' ability to manage and control development in the bayou's watershed, as well as the entities' efforts to mitigate the effects of new development. Experts have weighed in on both sides of the debate, but the questions remain unsettled, and the merits of these homeowners' claims depend on their resolution.

## C. Public Use

The government entities assert that no evidence exists of a taking for public use.

They argue that property is only "damaged for public use" if the "governmental entity is aware that its action will necessarily cause physical damage to certain private property, and yet determines that the benefit to the public outweighs the harm caused to that property." *Jennings*, 142 S.W.3d at 314. The entities' arguments on this point, however, merely repeat their arguments concerning intent and causation: the entities made no conscious decision to sacrifice the plaintiffs' property for public use, and their conduct did not cause the flooding, so it was not for public use. In response, the homeowners contend the entities approved development and made drainage-plan decisions for the sake of the public.

At least some evidence exists that in approving new development and drainage plans causing flooding, the entities' were acting for a public use. To the extent the government entities were substantially certain the homeowners' homes would flood because of unmitigated development, but sacrificed their homes for the sake of new development, this was for a public use. If the homeowners bore the burden of the growing community; then, "in all fairness and justice, [the burden] should be borne by the public as a whole." *Gragg*, 151 S.W.3d at 554.

## III. Conclusion

A fact question exists as to each element of the homeowners' takings claim. To conclude that there is a question of fact is not to hold that government entities have a duty to prevent all flooding. Rather, it means the plaintiffs have presented at least some evidence of their takings claim, and a jury should evaluate the evidence to reach a conclusion. In other words, the government entities' plea to the jurisdic-

tion should be denied. Because the Court holds otherwise, I respectfully dissent.